UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACOB MARTIN,

        Petitioner,

v.

KENNETH McKEE,

        Respondent.

_____/

Hon. Robert Holmes Bell

Case No. 1:06-CV-536

## REPORT AND RECOMMENDATION

This matter is before the Court on Martin's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Martin's petition be **denied**.

## BACKGROUND

As a result of events which occurred on July 17, 1999, Petitioner was charged with murder. Several individuals testified at Petitioner's bench trial. The relevant portions of their testimony are summarized below.

1

**Brad Vinton**

Vinton testified that on a morning in November 1999, he went to the Allegan State Game Area to prepare his deer blind for the upcoming deer hunting season. (Trial Transcript, October 10, 2000, 3-5). As Vinton was walking through the Game Area, he discovered a skull. (Tr. 6-7). Vinton immediately returned home and contacted the police. (Tr. 7-8). Vinton then returned with the police to the Game Area to show them the location of the skull. (Tr. 8-9).

**Kenneth Blackwell**

As of November 12, 1999, Blackwell was employed as an Allegan County Deputy Sheriff. (Trial Transcript, October 10, 2000, 3-5). That morning, Blackwell and Detective Richard Brooks were dispatched to Brad Vinton's residence, after which they accompanied Vinton to the location in the Game Area where he discovered the skull. (Tr. 12-15, 30-32). After locating the skull, Deputy Blackwell requested that evidence technicians and detectives be dispatched to the scene. (Tr. 15). A search of the area near the skull revealed "several areas where [the authorities] found bones and clothing." (Tr. 15-16).

**Greg Berens**

As of November 12, 1999, Berens was employed as an evidence technician for the Allegan County Sheriff's Department. (Trial Transcript, October 10, 2000, 20-21). At approximately 12:15 p.m. that day, Berens was dispatched to the location in the Game Area where Brad Vinton discovered the skull. (Tr. 20-21). Including the area where the skull was discovered, Berens' investigation revealed "approximately 10 different areas" in which bones were located. (Tr.

2

23).  These areas were "scattered over quite a large area," with the furthest being 200-300 feet away from the skull.  (Tr. 23-24).  Berens also discovered a pair of blue jean shorts, a t-shirt, and a pair of sunglasses.  (Tr. 24).

**Richard Brooks**

As of November 12, 1999, Brooks was employed as an Allegan County Deputy Sheriff.  (Trial Transcript, October 10, 2000, 30).  Brooks accompanied Brad Vinton and Deputy Blackwell to the location in the Game Area where Vinton located the skull.  (Tr. 30-32).

**Beth McVeigh**

McVeigh was John Torrance's sister.  (Trial Transcript, October 10, 2000, 43).  McVeigh last saw her brother on July 14, 1999.  (Tr. 43).  As of that date, Torrance was living at the Chateau Trailer Park, but McVeigh did not know with whom her brother was living.  (Tr. 45).  She testified that Torrance suffered from bi-polar disorder and "had an alcohol problem."  (Tr. 46).

**Toll Linda Simmons**

Simmons holds a Ph.D. in anthropology.  (Trial Transcript, October 10, 2000, 52).  In addition to her teaching duties, Dr. Simmons "assist[ed] local law enforcement agencies and medical examiners as a forensic anthropologist."  (Tr. 52).  Dr. Simmons was qualified by the court to testify as an expert in forensic anthropology.  (Tr. 52-54).

On November 12, 1999, Dr. Simmons accompanied law enforcement officials to the site in the Game Area where Brad Vinton located the skull.  (Tr. 54-55).  After law enforcement

authorities recovered the various skeletal remains, they were provided to Dr. Simmons for analysis. (Tr. 57-58).  An analysis of dental records revealed that the skull was that of John Torrance.  (Tr. 61-62).  This conclusion was consistent with Dr. Simmons' analysis of the other skeletal remains.  (Tr. 58-62).  Dr. Simmons testified that "there was no skeletal evidence that would indicate how [Torrance] died."  (Tr. 64).

**Rhonda Erskine**

Erskine testified that "sometime in July" 1999, she attended a party at the trailer in which Christopher Stidham, Christin Nesius, and John Torrance resided.  (Trial Transcript, October 10, 2000, 69-71, 74-77).  At some point in the evening, Christopher Stidham found Torrance in a bedroom with his son.  (Tr. 72).  Erskine heard "yelling and screaming" coming from inside the bedroom.  (Tr. 72).  Stidham exited the bedroom and stated that Torrance "had the baby in bed with him."  (Tr. 72).  Torrance then exited the bedroom.  (Tr. 73).  Torrance appeared to be "kinda drunk and staggering around."  (Tr. 73).  Torrance also appeared to have "a little bit of blood coming from the corner of his mouth."  (Tr. 73).  Fearful that the police would be called to the trailer, Erskine left the party.  (Tr. 73-74).  Erskine never saw John Torrance again.  (Tr. 71, 75-76).

Approximately "a week or two" later, Erskine moved into the trailer with Christopher Stidham and Christin Nesius.  (Tr. 74-75).  Erskine moved into the room in which John Torrance had stayed.  (Tr. 74-76).  Prior to Erskine moving in, she and Stidham "cleaned the whole room out" and "wiped everything down."  (Tr. 74).  Stidham told Erskine this was necessary because Torrance suffered from Hepatitis.  (Tr. 74).  Erskine and Stidham then "bagged up" all of Torrance's clothes and placed them outside.  (Tr. 74-76).  They also flushed all of Torrance's medication down the

toilet.  (Tr. 74-76).

**Craig Deaner**

As of July 1999, Deaner resided in the Chateau Trailer Park in the trailer "next door" to John Torrance.  (Trial Transcript, October 10, 2000, 85-86).  Deaner testified that he was present during an incident that occurred that month at Torrance's residence.  (Tr. 87-88).  According to Deaner, the incident concerned people "being upset about something going on with [Torrance and] one of the children."  (Tr. 87).  Deaner observed Petitioner and "Chris" beating and kicking John Torrance.  (Tr. 88-89).  Deaner never saw Torrance again after that night.  (Tr. 90).

**Christin Nesius**

As of July 1999, Nesius was married to Christopher Stidham.  (Trial Transcript, October 10, 2000, 94-95).  They lived in the Chateau Estates Trailer Park.  (Tr. 94).  Nesius had a daughter, Rose, from a previous relationship who lived with them.  (Tr. 95-96).  Rose was two years old as of July 1999.  (Tr. 95).  Stidham had a son, Christopher, from a previous relationship.  (Tr. 95-96).  As of July 1999, Christopher was two years of age.  (Tr. 95-96).  Young Christopher did not live with his father, but "was there occasionally for visitation."  (Tr. 96).  John Torrance also lived with Nesius and Stidham as of July 1999.  (Tr. 98-101).  The group lived in the Chateau Estates Trailer Park.  (Tr. 94).

Nesius testified regarding a party that was held at her trailer on July 17, 1999.  (Tr. 101).  Nesius testified that John Torrance had been drinking all day and that at some point in the evening Torrance "had gone off to bed."  (Tr. 101-05).  Nesius and others later heard baby

Christopher crying.  (Tr. 105).  Christopher Stidham and Petitioner "found baby Christopher in John's room with his shorts off."  (Tr. 105).  Nesius took the baby into her bedroom.  (Tr. 105-06).  After entering her bedroom, Nesius could hear that there was a fight taking place in the kitchen and living room area of the trailer.  (Tr. 106-07).  After the fight, Nesius observed that John Torrance "had a huge bump on the side of his head."  (Tr. 107).  Petitioner "checked" Torrance and "said that he was fine."  (Tr. 108).

Torrance returned to his room and Nesius, Stidham, Petitioner sat down at the kitchen table.  (Tr. 108).  Stidham then looked at Petitioner and made a slashing motion across his throat, to which Petitioner "nodded" in agreement.  (Tr. 108).  Stidham and Petitioner then "started getting stuff together." (Tr. 108).  Stidham told Nesius to get them some t-shirts, something she "don't mind getting dirty."  (Tr. 109).  Stidham told Nesius to also get them "some extra shoes" and "pillow cases."  (Tr. 109).  Stidham and Petitioner "put a change of clothes in the pillow cases."  (Tr. 109).  Stidham and Petitioner also located a filet knife and a box cutter.  (Tr. 110).  Stidham and Petitioner then "got John [Torrance] and took him out of the house."  (Tr. 110).  The three then drove away.  (Tr. 112).  Nesius never saw John Torrance again.  (Tr. 112).

The following morning Petitioner told Nesius that he "had stabbed [Torrance] in the neck after [Stidham] had told him to."  (Tr. 113).  Petitioner told Nesius that he and Stidham then kicked Torrance in the chest "to keep his blood pumping so he would bleed to death."  (Tr. 114).  Petitioner showed Nesius the filet knife which was covered in "blood and bone."  (Tr. 114-15).  A "few days" later Stidham placed the knife in cement and "threw it in Lake Michigan."  (Tr. 115).

**Dr. Joyce DeJong**

Dr. DeJong testified that she was a forensic pathologist and served as Director of Forensic Servies at Sparrow Hospital and the Chief Medical Examiner for Allegan County.  (Trial Transcript, October 11, 2000, 3-4).  Dr. DeJong participated in the analysis of John Torrance's remains recovered from the Allegan State Game Area.  (Tr. 4-8).  Dr. DeJong testified that the condition of Torrance's remains were not inconsistent with him having been murdered by a knife wound to the throat.  (Tr. 8-12).

**Rick Lee Cain**

Cain testified that as of November 1999, he was a Lieutenant with the Allegan County Sheriff's Department, in charge of the Detective Bureau.  (Trial Transcript, October 11, 2000, 36-37).  On November 23, 1999, Lieutenant Cain became involved in the investigation of the death of John Torrance.  (Tr. 37-38).  Petitioner and Christopher Stidham were initially interviewed by Detective Aloffs, with the Kalamazoo Department of Public Safety.  (Tr. 39).  These interviews yielded no clues into how John Torrance died.  (Tr. 39).  In mid-April 2000, Lieutenant Cain interviewed two potential witnesses, Jack Wine and Cathy Wine.  (Tr. 39-40).  As a result of these interviews, Cain wanted to talk with Petitioner about the death of John Torrance.  (Tr. 40).  Jack Wine told Cain that "he'd locate [Petitioner] and bring him to [Cain] for an interview."  (Tr. 40).

Lieutenant Cain was subsequently able to arrange to speak with Petitioner.  (Tr. 40-41).  On May 1, 2000, Cain, Detective Aloffs, and Detective Patrick O'Reilly spoke with Petitioner.  (Tr. 41).  Prior to the interview, Petitioner was advised of his Miranda rights and he agreed to speak with the police.  (Tr. 41-44).  Petitioner's attorney was present during the entire interview.  (Tr. 41).

When asked about John Torrance, Petitioner stated that "Chris Stidham stuck him through the neck with a filet knife." (Tr. 44). Petitioner asserted that this resulted from an incident that occurred earlier that evening involving Torrance and Stidham's son. (Tr. 44-45). Petitioner denied participating in the subsequent fight between Torrance and Stidham. (Tr. 45-46). Petitioner acknowledged departing Stidham's residence with Stidham and Torrance later that evening. (Tr. 45-46). Petitioner told the police that Stidham instructed him to drive to the Game Area. (Tr. 46).

According to Petitioner, after he stopped the vehicle Stidham and Torrance exited. (Tr. 46). Petitioner stated that he then "got out of the car and the next thing he knew Torrance was laying on the ground with a filet knife through his neck." (Tr. 46). Petitioner stated that he did not actually witness Stidham stab Torrance. (Tr. 46-47). Petitioner asserted that he did not know that Stidham planned to kill Torrance. (Tr. 47). Petitioner also denied having any involvement in the subsequent disposition of the filet knife. (Tr. 47-48). Petitioner told the police that after the killing he went to Oklahoma with Rhonda Erskine. (Tr. 49). Cain felt that Petitioner was "minimizing his involvement" in Torrance's killing, so he asked Petitioner if he would be willing to participate in a polygraph examination.[1] (Tr. 50-51). Petitioner agreed. (Tr. 51).

On May 9, 2000, Petitioner and his attorney met with Lieutenant Cain and Detective O'Reilly immediately prior to the polygraph examination. (Tr. 52-53). Cain wanted to speak with Petitioner prior to the polygraph examination to "try and clear up some points he made" and to also inform Petitioner "that [he] felt he was minimizing his involvement in the first interview." (Tr. 53). Prior to speaking with Lieutenant Cain, Petitioner was informed of his Miranda rights. (Tr. 53).

---

[1] While evidence regarding polygraph examinations is generally not admissible at trial, Petitioner, because he wanted "to have into evidence that he voluntarily submitted to a polygraph," agreed to permit the prosecutor to pursue this line of questioning. (Tr. 42-43).

Petitioner's attorney was again present during this interview.  (Tr. 53).  When asked about the incident in the Game Area, Petitioner provided a different account.  (Tr. 53-54).  Specifically, Petitioner told the police that after he exited the car, Stidham threw him a box cutter.  (Tr. 53-54).  Petitioner allegedly threw the box cutter back to Stidham and told him "he didn't want to do anything."  (Tr. 54).  Petitioner asserted that he had witnessed Stidham stab Torrance.  (Tr. 55).  Petitioner also acknowledged taking part in the subsequent disposition of the filet knife.  (Tr. 54).  Following this interview, Petitioner was interviewed by Detective Lieutenant Shawn Loughrige, a polygraph examiner with the Michigan State Police.  (Tr. 56, 67-68).

Prior to beginning the actual polygraph examination, Lieutenant Loughrige conducted a "pre-test" interview of Petitioner.  (Tr. 56-57).  Petitioner reiterated the version of events he told to Lieutenant Cain.  (Tr. 57).  After this "pre-test" interview, Loughrige exited the room and spoke with Cain briefly.  (Tr. 57-58).  When Loughrige re-entered the interview room and prepared to begin the polygraph examination, Petitioner began "whimpering and crying" and admitted that he "did it."  (Tr. 58).  Petitioner stated that, "I took the knife and I stuck it in his throat."  (Tr. 58).

**Shawn Loughrige**

As of May 2000, Loughrige was employed as Detective Lieutenant in the Michigan State Police polygraph division.  (Trial Transcript, October 11, 2000, 67-71).  Lieutenant Loughrige met with Petitioner on May 9, 2000, for the purpose of administering a polygraph examination.  (Tr. 71-73).  Petitioner was accompanied by his attorney.  (Tr. 73).  Before speaking with Petitioner, Loughrige informed Petitioner of his Miranda rights, which he agreed to waive.  (Tr. 73-76).  Loughrige also informed Petitioner of his "polygraph rights."  (Tr. 73-76).

Before beginning the polygraph examination, Lieutenant Loughrige spoke with Petitioner about the killing of John Torrance. (Tr. 76-78). Petitioner asserted that he had not participated in Torrance's killing and that he was just "a witness." (Tr. 77-78). Lieutenant Loughrige told Petitioner that he did not believe he was "telling the whole truth." (Tr. 78-79). Petitioner then told Loughrige that he had cut Torrance's arm with the box cutter. (Tr. 80). Lieutenant Loughrige told Petitioner that it was important that he tell the truth, at which point Petitioner began crying and admitted that he stabbed Torrance in the neck. (Tr. 80-83).

**Patrick O'Reilly**

As of November 1999, O'Reilly was employed as a detective with the Allegan County Sheriff's Department. (Trial Transcript, October 11, 2000, 96-97). O'Reilly testified that on November 14, 1999, an officer searching the crime scene discovered a wallet containing John Torrance's Michigan identification card. (Tr. 97-101). O'Reilly subsequently obtained Torrance's dental records which were used to identify the remains. (Tr. 105-07).

Detective O'Reilly accompanied Lieutenant Cain when he initially interviewed Petitioner. (Tr. 108). O'Reilly testified that Cain informed Petitioner of his Miranda rights prior to speaking with him. (Tr. 108-09). Petitioner waived his rights and agreed to speak with the police with his attorney present. (Tr. 108-09). Petitioner denied participating in Torrance's killing, asserting that Christopher Stidham killed Torrance. (Tr. 109-10). Petitioner also denied participating in the subsequent disposition of the filet knife used to kill Torrance. (Tr. 110-11).

Detective O'Reilly was present when Petitioner was interviewed by Lieutenant Cain on May 9, 2000. (Tr. 112). Prior to this interview, Petitioner was advised of his Miranda rights,

10

which he agreed to waive.  (Tr. 112).  During this interview, Petitioner reported that after arriving at the Game Area, Stidham tried to get him to stab Torrance with the box cutter, but that he refused.  (Tr. 113).  Petitioner acknowledged that he helped dispose of the filet knife.  (Tr. 113-14).  A short time later, Petitioner confessed to Lieutenant Loughrige.  (Tr. 114-16).

**Jacob Martin**

Petitioner testified about the events that occurred on the night of John Torrance's killing.  Petitioner testified that he was at Christopher Stidham's residence with Stidham, Christin Nesius, Rhonda Erskine, and John Torrance.  (Trial Transcript, October 11, 2000, 130-32).  Petitioner testified that "everybody" was drinking.  (Tr. 130).  At some point in the evening, baby Christopher started crying.  (Tr. 132).  Stidham found his son in the front bedroom crying, at which point Stidham and Petitioner began placing Torrance's belongings in a garbage bags.  (Tr. 132-33).  Petitioner testified that he and Stidham were "gonna take [Torrance] to his guardians" because "he possibly molested [Stidham's] son."  (Tr. 133).

According to Petitioner, he began driving to Paw Paw where Torrance's guardians lived.  (Tr. 134-35).  When they were unable to locate Torrance's guardians, the trio "headed out towards the State Game Area."  (Tr. 135).  At some point, Stidham told Petitioner to stop the car, at which point Stidham told Torrance to "get out."  (Tr. 136).  Petitioner exited the car and asked, "what's up?"  (Tr. 137).  Stidham said, "not much" and then threw Torrance to the ground.  (Tr. 137).  Stidham then attempted without success to cut Torrance's throat with the box cutter.  (Tr. 137).  Stidham then "threw the box cutter at [Petitioner] and wanted [him] to help."  (Tr. 137).  Petitioner refused to participate, at which point Stidham "pulled out a filet knife and ran it through

11

his throat." (Tr. 137). Petitioner testified that he subsequently went to Oklahoma, which he described as "one of them spur of the moment things, one of them adventure things." (Tr. 143). Petitioner denied confessing to Lieutenant Loughrige that he stabbed John Torrance. (Tr. 148).

**Jack Wine**

Wine testified that when he went to prison, Petitioner, who was dating Wine's ex-wife, "took care of [his] kids." (Trial Transcript, October 11, 2000, 174). After Petitioner broke up with Wine's ex-wife, Wine allowed Petitioner to live with him. (Tr. 176). Wine testified that Petitioner had never lied to him and that his kids "love him to death." (Tr. 176-77).

Following the presentation of evidence, the jury found Petitioner guilty of second degree murder. (Trial Transcript, October 12, 2000, 56-57). Petitioner was sentenced to serve 39-60 years in prison. (Sentence Transcript, December 1, 2000, 9). Petitioner appealed his conviction in the Michigan Court of Appeals, asserting the following claims:

I.   DEFENDANT'S CONFESSION WAS INVOLUNTARY AS IT WAS INDUCED BY EXPECTATIONS OF LENIENCY IN RETURN FOR HIS COOPERATION, AND THE TRIAL COURT ERRED IN DENYING HIS MOTION TO SUPPRESS THE CONFESSION

II.  THE TRIAL COURT ERRONEOUSLY DENIED A DEFENSE REQUEST FOR AN INSTRUCTION ON THE COGNATE LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER, WHERE THERE WAS SUFFICIENT EVIDENCE TO SUPPORT SUCH A CONVICTION, IN VIOLATION OF MR. MARTIN'S STATE AND FEDERAL DUE PROCESS RIGHTS TO BE TRIED BY A PROPERLY INSTRUCTED JURY

III.   DEFENDANT IS ENTITLED TO RESENTENCING
BECAUSE OFFENSE VARIABLE 3 OF THE
STATUTORY SENTENCING GUIDELINES WAS
MISSCORED AND THE SENTENCE IMPOSED
AMOUNTS TO A DEPARTURE FROM THE
STATUTORY SENTENCING GUIDELINES
IMPOSED WITHOUT COMPLIANCE WITH
DEPARTURE REQUIREMENTS

IV.   DEFENDANT'S SENTENCE MUST BE SET
ASIDE WHERE HIS ATTORNEY RENDERED
CONSTITUTIONALLY INEFFECTIVE
ASSISTANCE OF COUNSEL AND THERE IS A
REASONABLE PROBABILITY THAT THE
OUTCOME WOULD HAVE BEEN DIFFERENT

V.   THE TRIAL COURT ERRED IN DEFENDANT'S
REQUEST FOR SUBSTITUTE COUNSEL, WHEN
IT BECAME APPARENT THAT THERE HAD
BEEN A BREAKDOWN IN THE RELATIONSHIP
BETWEEN THE DEFENDANT AND HIS
COUNSEL OVER HOW THE CASE SHOULD BE
TRIED

VI.   THE TRIAL COURT IMPERMISSIBLY INVADED
THE JURY'S FACT FINDING FUNCTION BY
INSTRUCTING THEM THAT DEFENDANT'S
STATE OF MIND COULD BE INFERRED FROM
THE USE OF A DANGEROUS WEAPON

The court affirmed Petitioner's conviction, but finding that the sentencing guidelines had been incorrectly calculated, remanded the matter for re-sentencing. *People v. Martin,* No. 231696, Opinion (Mich. Ct. App., Dec. 13, 2002). Petitioner was subsequently re-sentenced to serve 29-60 years in prison. (Sentence Transcript, March 28, 2003, 12). Petitioner appealed the matter to the Michigan Court of Appeals, asserting the following issue:

I.   IS DEFENDANT ENTITLED TO RESENTENCING
WHERE IT APPEARS THAT THE SENTENCING

13

JUDGE RELIED ON AN INACCURATE PERCEPTION OF THE LAW, AND SO FAILED TO RECOGNIZE THAT HE HAD THE SENTENCING DISCRETION TO NOT IMPOSE A HABITUAL OFFENDER SENTENCE, WHEN THE PROSECUTOR INSISTED THAT THE JUDGE IMPOSED SUCH A SENTENCE AT THE INITIAL SENTENCING?

The court affirmed Petitioner's sentence. *People v. Martin*, No. 248147, Order

(Mich. Ct. App., Oct. 19, 2004).  Asserting the following issues, Petitioner later moved in the

Michigan Supreme Court for leave to appeal:

I.     DEFENDANT'S CONFESSION WAS INVOLUNTARY AS IT WAS INDUCED BY EXPECTATIONS OF LENIENCY IN RETURN FOR HIS COOPERATION, AND THE TRIAL COURT ERRED IN DENYING HIS MOTION TO SUPPRESS THE CONFESSION

II.    THE TRIAL COURT ERRONEOUSLY DENIED A DEFENSE REQUEST FOR AN INSTRUCTION ON THE COGNATE LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER, WHERE THERE WAS SUFFICIENT EVIDENCE TO SUPPORT SUCH A CONVICTION, IN VIOLATION OF MR. MARTIN'S STATE AND FEDERAL DUE PROCESS RIGHTS TO BE TRIED BY A PROPERLY INSTRUCTED JURY

III.   DEFENDANT IS ENTITLED TO RESENTENCING BECAUSE OFFENSE VARIABLE 3 OF THE STATUTORY SENTENCING GUIDELINES WAS MISSCORED AND THE SENTENCE IMPOSED AMOUNTS TO A DEPARTURE FROM THE STATUTORY SENTENCING GUIDELINES IMPOSED WITHOUT COMPLIANCE WITH DEPARTURE REQUIREMENTS

IV.    DEFENDANT'S SENTENCE MUST BE SET ASIDE WHERE HIS ATTORNEY RENDERED

14

CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL AND THERE IS A REASONABLE PROBABILITY THAT THE OUTCOME WOULD HAVE BEEN DIFFERENT

V.  THE TRIAL COURT ERRED IN DEFENDANT'S REQUEST FOR SUBSTITUTE COUNSEL, WHEN IT BECAME APPARENT THAT THERE HAD BEEN A BREAKDOWN IN THE RELATIONSHIP BETWEEN THE DEFENDANT AND HIS COUNSEL OVER HOW THE CASE SHOULD BE TRIED

VI.  THE TRIAL COURT IMPERMISSIBLY INVADED THE JURY'S FACT FINDING FUNCTION BY INSTRUCTING THEM THAT DEFENDANT'S STATE OF MIND COULD BE INFERRED FROM THE USE OF A DANGEROUS WEAPON

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Martin*, No. 127595, Order (Mich., Aug. 30, 2005). On July 28, 2006, Petitioner initiated the present action, asserting the following claims:

I.  PETITIONER'S CONFESSION WAS INVOLUNTARY AS IT WAS INDUCED BY EXPECTATIONS OF LENIENCY IN RETURN FOR HIS COOPERATION, AND THE TRIAL COURT ERRED IN DENYING HIS MOTION TO SUPPRESS THE CONFESSION

II.  THE TRIAL COURT ERRONEOUSLY DENIED A DEFENSE REQUEST FOR AN INSTRUCTION ON THE COGNATE LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER, WHERE THERE WAS SUFFICIENT EVIDENCE TO SUPPORT SUCH A CONVICTION, IN VIOLATION OF MR. MARTIN'S STATE AND FEDERAL DUE PROCESS RIGHTS TO BE TRIED BY A PROPERLY INSTRUCTED JURY

15

III.   THE TRIAL COURT ERRED IN DENYING
PETITIONER'S REQUEST FOR SUBSTITUTED
COUNSEL, WHEN IT BECAME APPARENT
THAT THERE HAD BEEN A BREAKDOWN IN
THE RELATIONSHIP BETWEEN THE
PETITIONER AND HIS COUNSEL OVER HOW
THE CASE SHOULD BE TRIED

IV.   THE TRIAL COURT IMPERMISSIBLY INVADED
THE JURY'S FACT FINDING FUNCTION BY
INSTRUCTING THEM THE DEFENDANT'S
STATE OF MIND COULD BE INFERRED FROM
THE USE OF A DANGEROUS WEAPON

**STANDARD OF REVIEW**

Martin's petition is subject to the provisions of the Antiterrorism and Effective Death

Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive

standards for granting habeas relief under the following provisions:

(d)   An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court
shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless
the adjudication of the claim —

(1)   resulted in a decision that was contrary to, or involved
an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of
the United States, or

(2)   resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to

16

"prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case"

17

or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## ANALYSIS

I.          **Voluntariness of Petitioner's Confession**

Petitioner asserts that his confession should not have been admitted into evidence. Petitioner does not dispute that he was informed of (and waived) his *Miranda* rights before offering his confession. Instead, Petitioner asserts that the waiver of his *Miranda* rights was not voluntary, but was instead the product of coercion and intimidation.

The Supreme Court has long recognized that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-

18

incrimination." *Thompkins v. Berghuis*, 547 F.3d 572, 582 (6th Cir. 2008) (quoting *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)).  Courts "must presume that a defendant did *not* waive his rights" and the prosecutor's burden to demonstrate otherwise "is great." *Thompkins*, 547 F.3d at 582 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).  When assessing whether a confession was voluntary, courts must "look to the totality of circumstances." *Withrow v. Williams*, 507 U.S. 680, 693 (1993).  The relevant circumstances include: (1) the existence of police coercion; (2) the length and continuity of the interrogation; (3) the defendant's maturity, education, and mental health; and (4) whether the defendant was advised of his *Miranda* rights.  *Id.* at 693-94.  The ultimate question is whether "a defendant's will was overborne." *Dickerson v. United States*, 530 U.S. 428, 433-34 (2000).

Prior to trial, Petitioner moved to suppress his confession.  The trial court conducted a hearing on the matter at which Detective O'Reilly, Lieutenant Cain, and Lieutenant Loughrige testified.  Detective O'Reilly testified that he spoke with Petitioner on May 1, 2000.  (Hearing Transcript, July 31, 2000, 4).  This interview occurred in the office of Petitioner's counsel.  (Tr. 4). The following people were present during the interview: (1) Petitioner; (2) Petitioner's attorney; (3) Lieutenant Cain; (4) Detective Aloffs; and (5) Detective O'Reilly.  (Tr. 4-5).  Before speaking with Petitioner, Detective O'Reilly informed Petitioner (in the presence of his attorney) of his *Miranda* rights.  (Tr. 5).  Petitioner indicated that he understood his rights and agreed to waive them and speak with the police.  (Tr. 6).  Petitioner's attorney was present during the entire interview.  (Tr. 4-7). During this interview, Petitioner denied participating in any way in the murder of John Torrance. (Tr. 7).  Detective O'Reilly testified that Petitioner was not subjected to any force or coercion during this interview.  (Tr. 7).

Detective Cain testified that he spoke with Petitioner's attorney prior to this initial interview. (Tr. 27-28). Petitioner's counsel expressed the concern that "he didn't want somebody coming to his office as a client and being arrested for murder one from his office." (Tr. 28). In response, Lieutenant Cain told Petitioner's attorney that if Petitioner's involvement in John Torrance's death was confined to "assisting after the killing had occurred," that "he would not be arrested that day." (Tr. 28). Petitioner's counsel agreed and Petitioner was not arrested following this initial interview. (Tr. 28).

Detective O'Reilly testified that he again interviewed Petitioner on May 9, 2000, prior to the scheduled polygraph examination. (Tr. 8-9). The following people were present during this interview: (1) Petitioner; (2) Petitioner's attorney; (3) Lieutenant Cain; and (4) Detective O'Reilly. (Tr. 8). Prior to speaking with Petitioner, Detective O'Reilly informed Petitioner of his *Miranda* rights. (Tr. 10). Petitioner indicated that he understood and agreed to waive his rights and speak with the police. (Tr. 10). Petitioner again denied participating in the killing of John Torrance. (Tr. 11). Petitioner then met with Lieutenant Loughrige in preparation for the polygraph examination. (Tr. 12). Detective O'Reilly and Lieutenant Cain both testified that no promises or offers were made to Petitioner prior to or concerning this interview. (Tr. 13, 29). Detective O'Reilly and Lieutenant Cain both testified that Petitioner was not subjected to any force or coercion during this interview. (Tr. 13-14, 29).

Lieutenant Loughrige testified that he met with Petitioner on May 9, 2000, in preparation for a polygraph examination which he was scheduled to administer. (Tr. 46). Prior to speaking with Petitioner, Lieutenant Loughrige advised Petitioner of his *Miranda* rights, as well as his rights concerning the polygraph examination. (Tr. 47-48). Petitioner acknowledged that he

20

understood and agreed to waive his rights and speak with Loughrige and participate in the polygraph examination.  (Tr. 48-49).  Lieutenant Loughrige testified that he did not subject Petitioner to any force or coercion.  (Tr. 50).  This was confirmed by Detective O'Reilly and Lieutenant Cain, who observed this interview from another room.  (Tr. 12-14, 29-31).  Petitioner subsequently confessed his involvement in the murder of John Torrance.  (Tr. 50-51).

Petitioner presented no evidence at the suppression hearing and has likewise submitted in this Court no evidence in support of his claim.  Petitioner merely asserts that "the only logical way" to interpret his decision to confess was that he "would not confess all unless there was some conceived benefit to being so overly cooperative."  Such appeals to logic, no matter how persuasive, cannot overcome the complete absence of evidence in support of Petitioner's claim. Petitioner has presented no evidence that he was coerced, intimidated, or otherwise forced to confess. Petitioner does not dispute that he was informed of (and waived) his *Miranda* rights.  There exists no evidence that the police questioned Petitioner for an unreasonable length of time.  Finally, there exists no evidence that Petitioner's maturity, educational level, or mental health rendered him unable to understand the nature of his rights or the impact of his waiver thereof.  In sum, Petitioner has presented no evidence that his will was overborne by unlawful or inappropriate police conduct.

The trial court denied Petitioner's motion to suppress.  (Tr. 55-56).  The court found that Petitioner's confession was freely and voluntarily made.  (Tr. 55-56).  The Michigan Court of Appeals concluded that the trial court "correctly denied [Petitioner's] motion to suppress."  *People v. Martin*, No. 231696, Opinion at 2 (Mich. Ct. App., Dec. 13, 2002).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an

unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.                    Lesser Included Offense Instruction

Petitioner was charged in this matter with open murder. The jury was instructed that it could consider first or second degree murder. (Trial Transcript, October 12, 2000, 42-43). Petitioner requested that the jury also be instructed that it could consider the charge of manslaughter. (Tr. 45). The trial court rejected Petitioner's request on the ground that "there is no evidence" supporting such a charge. (Tr. 47). Petitioner asserts that he is entitled to habeas relief because the trial court improperly failed to provide the jury with the requested manslaughter instruction.

As is well recognized, "[g]enerally, federal habeas corpus relief is not available for errors of state law, such as claims for failure to instruct on a lesser included offense." *Williams v. Withrow*, 328 F.Supp.2d 735, 748 (E.D. Mich. 2004) (citing *Estelle v. McGuire*, 502 U.S. 62, 68 (1991)). To obtain relief in such a circumstance, Petitioner must establish that the alleged error rendered his trial fundamentally unfair or resulted in a miscarriage of justice. *See Bagby v. Sowders*, 894 F.2d 792, 796-97 (6th Cir. 1990). As the Sixth Circuit has recognized, however, "failure to instruct on a lesser included offense in a noncapital case" neither results in a miscarriage of justice nor constitutes a fundamental unfairness. *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (quoting *Bagby*, 894 F.2d at 797). Thus, this claim is without merit.

Petitioner asserts that the failure to instruct the jury on a lesser included offense merits habeas relief if "the evidence would warrant a finding of guilt on the lesser included offense, and a[n] acquittal on the greater offense." In support of this position, Petitioner relies on *Williams*

22

*v. Hofbauer*, 3 Fed. Appx. 456 (6th Cir., Feb. 6, 2001). Petitioner's support, however, is misplaced. The language from *Hofbauer* on which Petitioner relies (quoted immediately above) does not concern the standard applicable to claims asserted in a petition for writ of habeas corpus. *See Hofbauer*, 3 Fed. Appx. at 458 (citing to *United States v. Levy*, 904 F.2d 1026, 1031 (6th Cir. 1990)). The *Levy* case concerned an appeal of a criminal conviction obtained in federal court. With respect to the standard applicable in a petition for writ of habeas corpus, the *Hofbauer* court stated that "[a] claim for failure to so instruct in a noncapital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure." *Hofbauer*, 3 Fed. Appx. at 458 (citing *Bagby*, 894 F.2d at 797). Accordingly, for the reasons articulated above, this claim presents no issue on which habeas relief may be granted.

## III.          Substitution of Counsel

Less than one month before his trial was scheduled to begin, Petitioner moved the trial court to replace his court appointed attorney with "a lawyer who agrees with his legal desires." (Motion Hearing, September 15, 2000, 2). The Court denied Petitioner's motion. Petitioner argues that the trial court's decision deprived him of his Sixth Amendment right to counsel.

The Sixth Amendment to the United States Constitution provides that, [i]n all criminal prosecutions, the accused shall enjoy the right to. . .the Assistance of Counsel for his defence." U.S. Const. amend. VI. While an "essential" element of this right is the right to be represented by "counsel of one's choice," the right to be represented by chosen counsel "is not absolute." *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007) (citing *United States v.*

23

*Gonzales-Lopez*, 548 U.S. 140, 144 (2006)).  When considering a defendant's request to obtain substitute counsel, courts must consider the following factors: (1) timeliness of the request; (2) adequacy of the court's inquiry into the defendant's complaint; and (3) whether the alleged conflict between defendant and counsel is so great that it results in "a total lack of communication preventing an adequate defense." *Mooneyham*, 473 F.3d at 291.  The court must balance the defendant's right to counsel of his choice with the public's interest in the prompt and efficient administration of justice. *Id.*

An examination of these factors reveals that Petitioner's Sixth Amendment rights were not violated.  The trial court questioned Petitioner and his attorney regarding the basis for his request.  Petitioner stated that he was upset because his attorney had recommended that he accept a plea bargain which had been offered.  (Motion Hearing, September 15, 2000, 2-3).  Petitioner stated that he wanted an attorney that was "willing to go to trial instead of trying to talk [him] down from the trial."  (Tr. 3).  Petitioner's attorney stated that Petitioner's desire to go to trial notwithstanding, he was compelled to inform Petitioner of his various options and offer his professional advice regarding such.  (Tr. 3).  Counsel also asserted that he was willing to try the matter if Petitioner desired and would represent Petitioner to the best of his ability.  (Tr. 3).  A review of the record in this matter reveals that Petitioner's counsel presented a vigorous defense consistent with Petitioner's desires.

The Michigan Court of Appeals found that this claim was without merit.  *People v. Martin*, No. 231696, Opinion at 2-3 (Mich. Ct. App., Dec. 13, 2002).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an

24

unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.


**IV.**          **Jury Instruction**

When instructing the jury, the trial court stated that:

The defendant's state of mind may be inferred from the kind of weapon used, the type of wounds inflicted, the acts and words of the defendant, and any other circumstances surrounding the alleged killing.

You may infer that the defendant intended to kill if he used a dangerous weapon in a way that was likely to cause death.  Likewise, you may infer that the defendant intended the usual results that follow from the use of a dangerous weapon.

(Trial Transcript, October 12, 2000, 40-41).

Petitioner asserts that this instruction violated his constitutional rights because the jury was not instructed that "they need not make such an inference."  Petitioner asserts that this error deprived him of the presumption of innocence and permitted his conviction on less than guilt beyond a reasonable doubt.  In support of this claim, Petitioner relies on *Sandstrom v. Montana*, 442 U.S. 510 (1979).  The Court finds that Petitioner's reliance on this authority is misplaced.

In *Sandstrom*, the petitioner, David Sandstrom, confessed to killing Annie Jensen. *Id.* at 512.  Sandstrom was charged with "deliberate homicide" in that he "purposely or knowingly caused the death of Annie Jensen."  At trial, Sandstrom argued that because he did not "purposely or knowingly" kill Jensen he was not guilty of deliberate homicide.  *Id.*  The jury was instructed that "the law presumes that a person intends the ordinary consequences of his voluntary acts."  *Id.* at 513. Sandstrom was found guilty of deliberate homicide.  Sandstrom unsuccessfully challenged the

25

instruction in question in the state courts on the ground that it unlawfully shifted to the criminal

defendant the burden of disproving an element of the offense charged. *Id.* The Supreme Court

agreed to hear the matter and reversed Sandstrom's conviction.

> The Court first observed that:

> The threshold inquiry in ascertaining the constitutional analysis
> applicable to this kind of jury instruction is to determine the nature of
> the presumption it describes. That determination requires careful
> attention to the words actually spoken to the jury, for whether a
> defendant has been accorded his constitutional rights depends upon
> the way in which a reasonable juror could have interpreted the
> instruction.

*Id.* at 514 (internal citations omitted).

The Court found that the instruction in Sandstrom's case was improper because it

relieved the prosecution of its constitutional obligation to prove beyond a reasonable doubt every

element of the crime charged. *Id.* at 520-21. Accordingly, an instruction that "tells a jury to presume

any element of a crime without evidence is unconstitutional," as it improperly shifts to the criminal

defendant "the burden of disproving an element of the crime charged." *Caldwell v. Bell*, 288 F.3d

838, 841 (6th Cir. 2002) (quoting *Sandstrom*, 442 U.S. at 527).

There is a distinction, however, between mandatory instructions that shift the burden

of proof (as was the case in *Sandstrom*) and instructions that merely permit the jury to find a fact or

element at issue. *See, e.g., Lane v. Carlton*, 149 Fed. Appx. 374, 376-78 (6th Cir., Aug. 24, 2005)

(instructions that tell a jury that it "may infer" malice do not run afoul of *Sandstrom*); *Turnpaugh*

*v. Foltz*, 1986 WL 16141 at *3 (6th Cir., Dec. 2, 1986) (an instruction that tells a jury that it "may

infer" intent "allows an inference of intent but does not demand it" and, therefore, does not violate

*Sandstrom*).

26

The jury instruction at issue presently did not require the jury to find that Petitioner acted with the intent to kill. It simply instructed the jury that it could find that Petitioner acted with the requisite intent based upon the circumstances. In this respect, the Court notes that the jury was also instructed that Petitioner was presumed innocent and that the prosecutor bore the burden of establishing beyond a reasonable doubt every element of the crimes charged. (Trial Transcript, October 12, 2000, 30). The jury was further instructed that it had the responsibility of assessing the credibility of the witnesses and determining the facts. (Tr. 33).

The Michigan Court of Appeals found that this claim was without merit because the challenged instruction did not shift the burden of proof to Petitioner. *People v. Martin*, No. 231696, Opinion at 3-4 (Mich. Ct. App., Dec. 13, 2002). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Martin's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure

to file objections within the specified time waives the right to appeal the District Court's order.

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  April 8, 2009                                   /s/ Ellen S. Carmody

                                                ELLEN S. CARMODY
                                                United States Magistrate Judge